[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the judicial district of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff and the defendant, whose maiden name is Ellen D. Digiacomo, were married on April 25, 1987, at Greenwich, Connecticut. The plaintiff has resided continuously in the State of Connecticut for at least twelve months immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are two minor children issues of this marriage, William M. Hood born July 15, 1989, and Matthew T. Hood born November 5, 1991. No other minor children have been born to the defendant wife since the date of marriage of the parties. Neither party has received state assistance.
The parties are in dispute as to the cause of the breakdown of the marriage. From the evidence presented, the court finds that the sole cause of the breakdown of the marriage is the plaintiff's extramarital affair that commenced in 1991. That relationship ended in 1994. The plaintiff then resumed the relationship with the same woman in late 1996 or early 1997, and that relationship has continued to the present time.
The plaintiff has paid for airline tickets for the woman with whom he is involved for a trip to Texas. He also used frequent flier miles when he took her to Florida on one occasion. He also used his frequent flier miles for the benefit of her children on three occasions.
The plaintiff is thirty-five years old. The plaintiff is in good health.
The plaintiff presently has medical and dental insurance through his employer for the benefit of himself, the defendant and the two minor children. As part of his employment package, the plaintiff has life insurance in the amount of two times his annual salary up to a maximum of $300,000. He has chosen to purchase additional life insurance in the amount of two times his annual salary up to a maximum of $300,000 and life insurance for CT Page 7111 his spouse in the amount of $10,000 and $4000 per child. He presently participates in two retirement plans, one is a 401K plan and the second is a pension plan.
The plaintiff is employed as a sales manager for Hitachi Semiconductor. His principal place of employment is in Fishkill, New York. He is paid on a biweekly basis.
The earliest date that he may receive any bonuses in 1998, is in June of 1998. In June of 1997, he received a bonus of approximately $20,000 that by agreement of the parties the net amount was divided equally between them. In December of 1997, he received a gross bonus of $20,000 and a net bonus of approximately $12,000. Each of the two bonuses was based on the prior six months' performance. Bonuses are not guaranteed and are based on a sales performance formula that takes into account three factors: (1) individual performance; (2) division performance; and (3) account performance. The parties entered into a stipulation on July 17, 1997, coded No. 114.50 that was approved by the court on July 21, 1997. That stipulation provided that all bonuses received by the plaintiff in 1997 and 1998, until the entry of a decree in this matter, shall be held pending final resolution of — this matter. The parties agreed, however, as to the bonus paid in June of 1997, which the plaintiff represented was in the net amount of $11,000 that that bonus was to be divided equally between the parties. The defendant received $5720 from the initial $20,000 bonus received by the plaintiff, which amounted to one half of the net amount of that bonus. The December, 1997 bonus that the plaintiff received in the net amount of approximately $12,000 was placed into his checking account and the funds were then used to pay monthly expenses for his benefit and that of the defendant. The agreement to divide the June, 1997 bonus was to apply to that bonus only, and any other bonus division was to be made by agreement of the parties or further order of the court.
The plaintiff has a defined benefit plan shown on his financial affidavit dated March 26, 1998. That plan will pay approximately $3000 monthly at retirement in 2027. The plaintiff is presently vested in that plan. The plaintiff also has a 401K plan with a value of $79,488 as of March 23, 1998. The plaintiff has two accounts at First Union. The account designated on his affidavit as account No. 1 is his savings account in his name only, and the account designated at account No. 2 is a checking account in his name only. The balance in his savings account is CT Page 7112 $2281 and the balance in his checking account is $1800. He also has a money market account at USAA with a balance of $36,084. The plaintiff's financial affidavit under category 4D Bank Accounts states as follows: "approximately $25,000 from employment contract is contained in the accounts listed above." The plaintiff was first hired by his present employer approximately two and one-half years ago. He received a $75,000 bonus when his employment contract was signed. He has to repay $25,000 to his employer if he terminates his employment prior to October, 1998. There is no credible evidence that his employment will be terminated prior to October of 1998. The plaintiff's financial affidavit under category 4E states "reimbursement money due from employment $4500." The plaintiff initially expends money for business expenses for which he receives a dollar for dollar reimbursement from his employer. The $4500 represents the reimbursement due to him. That is a money market account. He has two life insurance policies, neither of which show any cash surrender value. One is in the face amount of $400,000 through the employer, and the second is in the amount of $250,000 with USAA. His employer pays for one half of the premium for his $400,000 life insurance policy and he pays for the other one half. No pendente lite orders were entered in this case for the payment of alimony or support. Since the dissolution started, the plaintiff has been paying the monthly mortgage payment, as well as all utilities on the family home, as well as all of the food expenses for the defendant and the children, and other expenses for her. In addition to the two bank accounts at First Union, there was a third account that presently has no remaining balance. The defendant had total access to drawing money from the third account. The defendant paid the condominium common charges from the third account, as well as water charges, cable bill and automobile insurance. The average monthly amount spent on behalf of the defendant and the children over a fourteen-month period in 1997 and 1998, was approximately $6700.
The plaintiff has use of an automobile through his employment with the employer paying the expenses to operate that vehicle. The plaintiff drives a Pontiac company car. He uses it in part for personal use and in part for business use. The company pays for the use of the vehicle by company gas credit card, as well as maintenance and insurance for the vehicle. He pays $75 biweekly to the company for the use of the vehicle. He also owns a 1996 Chevrolet Blazer with a value of $22,000 that the defendant uses. The Chevrolet Blazer shown on his affidavit was purchased new in 1996, for $28,000. CT Page 7113
During a period of approximately three months in 1998, the plaintiff's average hotel weekly bill has been approximately $300. His total gross annual wages including bonus for the calendar year 1997 was $158,744.32, which amounts to a gross weekly salary of $3052. His financial affidavit dated April 3, 1998, showed his gross weekly income as $3052. (His April 3, 1998 financial affidavit was misplaced and by agreement of the parties stated on the record on May 29, 1998, a substitute financial affidavit was filed. That substitute financial affidavit when run off of the computer of the plaintiff's attorney shows a date of May 29, 1998, while the actual date the financial affidavit was signed and acknowledged was April 3, 1998.) The plaintiff's current annual base salary is $138,187.40 with an incentive payment potential to his to receive up to a maximum annual payment of 40 percent of his base annual salary. His net weekly income for child support guidelines purposes is $1824.71. He currently has medical, dental, vision and prescription care health insurance for himself, the defendant and the children. He has twenty-six weeks short term disability salary through his employer and has purchased a long term disability plan that would extend his benefits in the amount of 75 percent of his base monthly salary up to a maximum of $10,000. In the event of his death, his beneficiaries are eligible to receive company-sponsored life insurance in the amount of two times his annual salary up to a maximum of $300,000.
The plaintiff's financial affidavit dated March 26, 1998, shows a Key Contribution Plan with a balance of $38,535 as of September, 1997. That is a plan that is set up for the benefit of employees at the discretion of management. It is totally funded by the plaintiff's employer. The Key Contribution Plan provides for different vesting schedules as selected by the administrator of the plan in its sole discretion. One of the vesting schedules is for the participant to vest in the first third of the grant (and the earnings thereof) on the first anniversary date of the plan of such grant, in the second third of the grant (and the earnings thereof) on the second anniversary of the date of such grant, and in the remainder of such grant (and the earnings thereof) on the third anniversary of the date of such grant. The selection for the plaintiff in the Key Contributor Program was made by his employer by letter dated July 2, 1996. That letter stated in part as follows:
 The basis of the plan is driven by your June and December CT Page 7114 incentive payments. Based upon the calculations of those incentives, HAL will contribute an additional 50 percent match which will be deferred. You will be eligible for the company match for three calendar years, and awards granted will pay out three years from the grant date. Your account started with your bonus payments of December, 1995
The Key Contributor Plan also provides under "allocation of grant" in part as follows:
 A participant's grant (or portion thereof) and a pro rata share of earnings thereon shall be paid out to the employee in a single lump sum as soon as is administratively possible after such grant (or portion therefore vests.
The court finds that the plaintiff is vested in two-thirds of his account that started with a bonus payment in December of 1995. The total balance in the plaintiff's account as of March 31, 1998, was $41,349.15 consisting of cash in a Benham Prime Money Market Fund of $19,694.78 plus investment results of $240.92, and stocks in the Twentieth Century Growth Fund with a total market value of $10,999.07 plus investment results of $1,447.98, and a second stock in the Twentieth Century Ultra Fund with a total market value of $10,665.30 plus investment results of $1,464.47.
The parties reached an agreement regarding the list of personal property items at the family home that the plaintiff can retain as shown on court exhibit A. The court approves of that agreement.
The plaintiff has as an asset, frequent flier miles from U.S. Air with a balance of 35,866 miles, United Airlines with a balance of 166,898 miles, and American Airlines with a balance of 28,627 miles for a total of frequent flier miles of 231,391 miles. The approximate fair market value of those miles is $4600.
From all the evidence presented, the court finds that the plaintiff has a greater opportunity for future acquisition of capital assets and income than does the defendant.
The defendant is thirty-four years old. The defendant has a bachelor's degree in economics that she obtained from the University of Connecticut in 1984. She was employed as a secretary until the parties married at an annual salary of CT Page 7115 approximately $18,000. Her last employment since the parties married was as a secretary in California that ended in approximately March of 1990, where she was earning a gross annual salary of approximately $20,000. Since the birth of her first child, she has not held any full-time or part-time employment. After the plaintiff vacated the family residence, she took adult education classes in computer bookkeeping and software processing. She has been under stress coping with the divorce action. At one point in time during the marriage, in 1991, when the defendant was pregnant with the youngest child, the plaintiff infected her with genital herpes. The plaintiff was diagnosed with genital herpes in July of 1991. He did not inform the defendant of that diagnosis. He continued having sexual relations with his wife after the diagnosis and did not take any steps for treatment. Herpes was not a cause of the breakdown of the marriage.
The defendant has 9758 frequent flier miles with United Airlines with a fair market value of approximately $195. Her financial affidavit dated March 20, 1998, shows day care expenses of $30 monthly. That is the day care expense she would incur if she obtained full time employment. The parties are in dispute as to the value of the 1996 Chevrolet Blazer. From the evidence presented, the court finds that the fair market value of that vehicle is $17,000. The defendant is currently unemployed. She intends to try to obtain employment in September of 1998, in the field of bookkeeping and accounting. Defendant is presently holding an I.R.S. refund check for a joint return filed by the parties in the amount of $8606. She has a First Union checking account with a balance of $1000 and a First Union savings account with a balance of $3278. Her only liability is for attorney's fees in this action.
The defendant paid $2500 in counsel fees regarding a domestic arrest in New York that took place as a result of a complaint filed by the plaintiff. She also paid to her present attorney in this dissolution action in excess of $6100. She still owes an estimated $3000 in attorney's fees regarding this dissolution action.
The family home is a townhouse that was purchased in 1991, in the names of the plaintiff and the defendant. The purchase price was $215,000. There is a mortgage with a balance of $153,339 through March of 1998. It has a fair market value of $245,000. CT Page 7116
The plaintiff and the defendant entered into a "real estate investment contract" with the plaintiff's mother in September of 1989, regarding the purchase by the plaintiff and the defendant of a condominium unit known as Main Chance Estates, Lot No. 199, Walnut Creek, California for $163,000. Under the terms of that contract, the plaintiff's mother agreed to loan the plaintiff and the defendant $23,000 in accordance with the terms of that contract. The plaintiff and the defendant also signed a promissory note to the plaintiff's mother dated May 22, 1989, in the face amount of $23,000. The California condominium was subsequently sold by the plaintiff and the defendant and they next purchased the current family condominium owned by them at Prospect Street, Ridgefield, Connecticut. The plaintiff and the defendant executed a new promissory note to the plaintiff's mother on September 30, 1991, in the face amount of $29,000 together with a new real estate investment contract. As of March 27, 1998, approximately $45,000 is due to the plaintiff's mother in the event the Ridgefield home were to be sold. When the California home was sold by the plaintiff and the defendant, no money was paid over to the plaintiff's mother from the proceeds of the sale. She allowed the California funds ($23,000) to be used towards the purchase of the Ridgefield property. The $29,000 originally owed to his mother for the purchase of the Ridgefield property is the $23,000 provided for the California property together with interest.
This court has considered the provisions of § 46b-82
regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property division, and has considered the provisions of § 46b-56 and § 46b-56a
regarding the issues of custody, joint custody and visitation, and has considered the provisions of § 46b-84 and the child support guidelines regarding the issue of support, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders.
 ORDERS
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY CT Page 7117
1. The plaintiff is ordered to pay to the defendant alimony in the sum of $700 per week. Alimony shall terminate upon the earliest of the following events: (a) the death of the plaintiff; (b) the death of the defendant; (c) November 5, 2005 — the youngest child will be eighteen on the above date and the defendant will then have less need for alimony than she presently has.
2. In addition to the $700 per week, the plaintiff shall pay to the defendant as alimony the sum of one-third of the gross amount of any bonuses or incentives which the plaintiff receives. This one-third includes any bonus that he may receive in June of 1998, in lieu of the existing pendente lite order regarding bonuses. The one-third bonus shall be payable for so long as the plaintiff is obligated to pay alimony to the defendant.
3. The provisions of § 46b-86 (a) are applicable, except that the defendant shall be entitled to earn $400 net weekly without that being grounds to modify the alimony order. Net weekly income consists of gross weekly income less federal and state income taxes and less social security taxes. The provisions of § 46b-86 (b) are also applicable.
4. The plaintiff is to make available to the defendant the health and dental insurance that is available through his place of employment for the maximum period allowed by law. The parties have to divide equally the cost of such insurance.
5. The plaintiff is to maintain $100,000 life insurance coverage on his life naming the defendant as beneficiary for so long as he is obligated to pay alimony. He is to provide to the defendant, verification that she is the designated beneficiary of such insurance policy and that such insurance policy is not encumbered or restricted in any way. In the event that for any reason he has not maintained said insurance at the time of his death while the obligation to maintain such insurance was in full force and effect, then the same shall be a charge against his estate.
C. BY WAY OF CUSTODY AND VISITATION
1. The parties shall retain joint legal custody of the two minor children. The defendant is designated as the primary residential parent. The plaintiff is granted visitation in accordance with the following schedule: (a) Week one: Friday at CT Page 7118 5:30 p. m. to Sunday at 4 p. m.; (b) Week two: Friday at 5:30 p. m. to Saturday at 6:30 p. m.; (c) Week three: Friday at 5:30 p. m. to Saturday at 6:30 p. m.; and (d) Week four: no visitation to the plaintiff. In addition, the plaintiff should have visitation with the children every Tuesday and Wednesday evening from 5:30 p. m. through 7 p. m. He is also granted alternate holiday visitation and visitation in the summer of three weeks, two of which may be consecutive. All transportation for the children is the responsibility of the plaintiff. The plaintiff also has the right to telephone contact with the children between the hours of 6:45 p. m. and 7:30 p. m. Monday through Friday.
2. While the parties were in dispute regarding the nature of the visitation order to be granted to the plaintiff, the court finds based on the manner in which the trial was presented that it is not necessary to prove a substantial change in circumstances in order to modify the present order after the filing by Family Services of its report.
D. BY WAY OF SUPPORT
1. The court finds that the plaintiff's income exceeds the maximum amount called for in the guidelines. The support guidelines provide that when the combined net weekly income exceeds $1750 weekly, then courts remain free to fashion appropriate child support awards on a case by case basis, provided the amount of support prescribed at the $1750 level is presumed to be the minimum that should be ordered in such cases. The amount prescribed for two children at a net weekly income of $1750 is $480 weekly. The plaintiff is ordered to pay to the defendant support in the amount of $500 per week. Support shall be paid for each child until such child attains the age of eighteen years of age or graduates from high school, whichever last occurs, but no later than nineteen years of age.
2. The plaintiff is to provide health and dental insurance for the benefit of the minor children.
3. The parties are to divide equally all health and dental expenses that are not covered by the plaintiff's health and dental insurance.
4. The plaintiff shall be entitled to claim both children as dependents for all tax reporting purposes for so long as he is current in all of his alimony and support orders at the end of CT Page 7119 such calendar year.
5. The plaintiff is to maintain $100,000 life insurance for each of the two children, naming each child as beneficiary until such child reaches the age of eighteen. In the event that for any reason he has not maintained said insurance at the time of his death while the obligation to maintain such insurance was in full force and effect, then the same shall be a charge against his estate.
E. BY WAY OF PROPERTY ORDERS
1. All the personal furniture and furnishings at the family residence are awarded to the defendant except for those items shown on court exhibit A, which items are awarded to the plaintiff.
2. The debt owed to the plaintiff's mother is to be paid by the plaintiff, and he is to hold the defendant harmless therefrom. The plaintiff has a right to claim as a deduction for federal and state income tax purposes all interest payments made by him to his mother on that debt.
3. The 1996 Chevrolet Blazer is awarded to the defendant. The plaintiff is to sign all documents necessary to complete this transfer by July 15, 1998.
4. The First Union checking account and the First Union savings account shown on the defendant's financial affidavit are both awarded to the defendant.
5. The Fidelity Investment Account shown on both the plaintiff's financial affidavit and the defendant's financial affidavit is awarded to the plaintiff.
6. The First Union account number one and the First Union account number two shown on the plaintiff's financial affidavit are both awarded to the plaintiff.
7. The U.S.A.A. account shown on both the plaintiff's financial affidavit and the defendant's financial affidavit is awarded to the defendant.
8. The IRS refund check shown on both the plaintiff's financial affidavit and the defendant's financial affidavit is CT Page 7120 ordered divided equally between the parties.
9. The 401K plan shown on the plaintiff's financial affidavit is awarded to the plaintiff.
10. The bonus that the plaintiff was supposed to divide equally with the defendant, but failed to do so, is awarded solely to the plaintiff.
11. The Key Contribution Plan shown on the plaintiff's financial affidavit is awarded to the plaintiff.
12. The reimbursement money due to the plaintiff from his employment shown on his financial affidavit is awarded solely to the plaintiff.
13. All of the frequent flier miles in the plaintiff's name are awarded to the plaintiff.
14. All of the frequent flier miles in the name of the defendant are awarded to the defendant.
15. The plaintiff is to quitclaim to the defendant all of his right, title and interest in the family home located at 120-5 Prospect Street, Ridgefield, Connecticut by July 20, 1998. The deed is to be delivered to the office of counsel for the defendant. The defendant is to pay the first mortgage on the family home and hold the plaintiff harmless therefrom.
16. The court awards to the defendant 50 percent of the pension benefits to which the plaintiff is entitled, as of the date he retires. This is to take place by QDRO. The court finds that the plaintiff's interest in his defined pension plan is vested. The plaintiff is ordered to elect a joint and survivorship option, if such option is available under his plan, by July 20, 1998. The defendant is responsible for preparing the appropriate QDRO documents. The court retains jurisdiction over any disputes that may exist regarding such documents.
17. All transfers are to be completed by July 20, 1998.
F. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either party. CT Page 7121
G. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and filing.
2. The parties are to exchange copies of their federal and state income tax returns by certified mail, return receipt or registered mail, return receipt within fifteen days after such returns have been filed for so long as there is an outstanding alimony and/or support order, or any outstanding arrearage from any such order.
Axelrod, J.